IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Callie M. Gooding,<br><br>                       Plaintiff,<br><br>     vs.<br><br>Michael J. Astrue,<br>Commissioner of Social Security,<br><br>                      Defendant. | Civil Action No. 6:08-855-CMC-WMC<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff protectively filed an application for supplemental security income (SSI) benefits on October 2, 2002, and an application for disability insurance benefits (DIB) on October 23, 2002, both alleging that she became unable to work on September 12, 2002. The applications were denied initially and on reconsideration by the Social Security

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

Administration. On August 1, 2005, the plaintiff requested a hearing. The administrative law judge, before whom the plaintiff, her attorney, two witnesses, and a vocational expert appeared on October 2, 2006, considered the case *de novo*, and on February 8, 2007, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on January 11, 2008. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)   The claimant met the insured status requirements of the Social Security Act through June 30, 2005.
>
> (2)   The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.).
>
> (3)   The claimant has the following severe impairments: borderline intellectual functioning, fibromyalgia, depression, cervical disc disease, obesity and arthritis (20 CFR 404.1520(c) and 416.920(c)).
>
> (4)   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> (5)   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform work with restrictions that require no lifting or carrying over 20 pounds occasionally and 1- pounds frequently; no standing and/or walking over 6 hours in an 8-hour workday; no more than occasional stooping, twisting, crouching, kneeling and climbing of stairs or ramps; and no climbing of ladders or scaffolds. She can perform simple, routine work in a supervised environment that involves no more than occasional interaction with the public or "team"-type interaction with coworkers.

  (6) The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

  (7) The claimant was born on May 6, 1954, and was 48 years old on the alleged disability onset date, which is defined as a younger individual. She is now 52 years old, which is "closely approaching advanced age" (20 CFR 404.1563 and 416.9634).

  (8) The claimant has a limited education and is able to communicate in English (20 CFR 404.1563 and 416.964).

  (9) The claimant's residual functional capacity for simple, routine work does not provide for the transferability of any job skills (20 CFR 404.1568 and 416.968).

  (10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

  (11) The claimant has not been under a "disability," as defined in the Social Security Act, from September 12, 2002, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment.  20 C.F.R. §404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R. §404.1503(a).  *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. §423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

**EVIDENCE PRESENTED**

The plaintiff was 48 years old as of her alleged onset date and 52 years old on the date of the ALJ's decision (Tr. 65). She completed the eleventh grade[2] with special assistance with speech, and worked in the past as a custodian and daycare assistant (Tr. 89, 94). She alleged disability due to fibromyalgia since September 2002, the date she last

---

[2]The plaintiff's disability report indicates she completed the 12th grade in 1972 (Tr. 94), but other records indicate that she dropped out of school in the 11th grade to get married (Tr. 275).

5

worked (Tr. 65, 88, 136). She also claims that low intellectual functioning and depression contributed to her disability.

By way of history, the plaintiff's elementary school records showed she performed in the 1st to 62nd percentile in her various subjects (Tr. 133), and her high school records showed she scored between 66 and 86 percent in her courses (Tr. 132). These records also showed an IQ score of 74 in the third grade and 65 in the eighth grade (Tr. 134-35).

The medical record shows a history of routine treatment for physical complaints dating back to 2002 which includes headaches, dizziness, body pain, thyroid problems, hypertension and swelling (Tr. 226-33). CT and MRI scans of the plaintiff's head were normal (Tr. 159-77, 187, 237-38), and Dr. Edward Tautjo, her family physician, later noted that her headaches were improved on medication (Tr. 219, 222, 224, 227, 229). In April 2002, she presented in the emergency department at Carolina Pines Medical Center complaining of dizziness, but she was improved upon discharge later that day (Tr. 143-54).

In May 2002, upon referral by Dr. Tautjo, the plaintiff presented to neurologist Dr. Sandra Abda for evaluation of "a lot of cosmic symptoms" and "pains everywhere." Examinations showed the plaintiff had spinal tenderness and swelling around her eyes, but she had a normal gait, normal lumbar range of motion, range of motion in her neck that was 80% of normal, normal reflexes, and full strength. X-rays showed cervical straightening and that she had a right-sided 7th cervical rib without a corresponding one on the left. Dr. Abda ordered further testing, including an MRI (Tr. 182-85).

On May 27, 2002, Dr. John Babich, a rheumatologist, examined the plaintiff and concluded that "[h]er constellation of symptoms, signs and physical examination findings are very consistent with fibromyalgia syndrome. Although she complains of multiple joint pain, I do not think that we are dealing with any inflammatory disease at this time. Her joint exam did not reveal any acute arthritis or synovitis [an inflammatory

process]." He prescribed conservative treatment with Pamelor (an antidepressant) and a fitness program, and he recommended that the plaintiff continue taking Mobic (anti-inflammatory), Tylenol, and vitamins (Tr. 180-81).

The following month, Dr. Abda noted that although Dr. Babich had diagnosed fibromyalgia, she had "no trigger points" upon examination (Tr. 179).

On July 31, 2002, upon Dr. Tautjo's referral (*see* Tr. 218-19), neurologist Dr. Urvi Desai evaluated the plaintiff 's complaints of headaches, dizziness, parasthesias, and neck pain for past five months. Dr. Tautjo noted she had a subtle Bell's palsy (weakness or paralysis due to nerve damage) on the right side of her face and diagnosed neck pain with radicular (radiating) symptoms. He ordered an MRI of her neck and an EEG, noting that her symptoms could be simple partial seizures (Tr. 212-14). The EEG was normal (Tr. 293-94), and the MRI showed a "small" central disc herniation at C4-5 (Tr. 188).

A month later, Dr. Desai noted that the plaintiff had been prescribed Darvocet (narcotic pain medication) and physical therapy for her fibromyalgia, that she had a normal gait and neurological status on examination, and her thyroid levels were normal. He referred her back to Dr. Abda and recommended a sleep-deprived EEG (Tr. 210-11), which was also normal (Tr. 291-92).

On September 27, 2002, Dr. Desai noted that the plaintiff had gained weight and was a good candidate for physical therapy. On examination, she was alert and oriented and had a normal attention span, clear speech, subtle right-sided Bell's palsy, full strength, and normal reflexes. He concluded her symptoms might be related to panic attacks, but prescribed Neurontin (medication for nerve pain) in case they were related to her fibromyalgia (Tr. 197-99).

As of early October 2002, the month after she alleges her disability began, Dr. Abda noted that the plaintiff was doing "fairly well" with fibromyalgia, although her neck pain

7

was worse. She prescribed Skelaxin (muscle relaxant), Bextra (anti-inflammatory) and physical therapy (Tr. 178, 288).

On October 16, 2002, Dr. Tautjo noted that the plaintiff had complained of shortness of breath and pressure in her chest, but an EKG showed that the symptoms were more gastrointestinal in nature. He noted that her headaches were improved on medication and listed myalgia, polyarthralgia and polyarthritis as possible causes of her body pain. He prescribed Elavil (antidepressant) and referred her back to Desai to follow up on her continuing complaints of dizziness and headaches (Tr. 204-07).

When the plaintiff followed up with Dr. Desai two weeks later, he noted that she was "stable" compared to her last visit and continued her current treatment regimen (Tr. 196).

As of December 4, 2002, the plaintiff had gained 9-10 pounds in the last month and had a "mild" headache, elevated blood pressure, chest pain, and shortness of breath with exertion. Dr. Tautjo referred her to cardiology for further work-up (Tr. 202-03, 239-74), but the findings were unremarkable, showing normal coronary arteries, normal sinus rhythm and no evidence of actual atrial fibrillation (abnormal heart contractions) (Tr. 201).

On January 20, 2003, David Wheeler, Ph.D., performed a psychological assessment of the plaintiff. The plaintiff told Dr. Wheeler she could care for her personal needs on good days, drive without limitations, do household chores such as sweeping, read her Bible, and teach a weekly Sunday School class. She also told him that she was comfortable in public but did not socialize. Dr. Wheeler noted that her posture, movements, and gait were normal. Mentally, she was fully oriented and had a depressed mood and a labile and congruent affect, normal speech, and coherent and goal-directed thought processes. Dr. Wheeler noted that she could perform simple calculations but appeared to forget oral instructions and had poor memory, good recent memory, and fair remote

memory. Testing showed a full scale IQ of 70, a verbal IQ of 73, and a performance IQ of 72, and that she read at the second grade level. Dr. Wheeler diagnosed "mild" major depressive disorder, a reading disorder, and a GAF of 45.[3] He said it appeared to be a valid assessment; that she could not perform simple and routine tasks for long periods or maintain concentration; that she would struggle interacting with peers but could do so with her co-workers and supervisors; and that she could, on good days, perform simple cleaning activities. He said she would need assistance handling her finances (Tr. 275-77).

About two weeks later, the plaintiff presented in the emergency department with chest pain, but testing was unremarkable, and she was discharged in improved condition (Tr. 278-87).

In late February 2003, a State agency psychologist reviewed all the evidence and completed a psychiatric review technique form. He indicated that the plaintiff had "mild" restrictions in activities of daily living, "moderate" difficulties in social functioning and concentration, persistence and pace, and no extended episodes of decompensation (Tr. 504-17). He also assessed the plaintiff's mental residual functional capacity. He found that the plaintiff was "moderately limited" in handling detailed instructions, maintaining concentration for extended periods, completing a work-week without interruptions from mental symptoms and interacting appropriately with the public, and that she was "not significantly limited" in any other areas of work-related mental functioning. He concluded

---

[3]A Global Assessment of Functioning (GAF) score is a snapshot of a condition at one point in time, and is not a longitudinal indicator of one's overall level of function. Moreover, the DSM-IV contains a "Cautionary Statement" indicating that the "specified diagnostic criteria for each mental disorder are offered as guidelines for making diagnoses" only and "may not be wholly relevant to legal judgments [such as] disability determination[s]." A GAF score of 41 to 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See* American Psychological Association, *Diagnostic and Statistical Manual - Text Revision* (2000) (DSM-IV-TR), *available on* Stat!Ref Library Cd-ROM (3rd Qtr. 2008).

the plaintiff was capable of handling short and simple instructions, performing simple tasks for "2+" hours without special supervision, maintaining a regular work schedule while missing an occasional day due to depression, making simple work-related decisions, requesting assistance from others, using available transportation, adhering to basic standards of hygiene and safety, and sustaining appropriate interaction with peers and co-workers, but would need a job with minimal public contact (Tr. 500-03).

The same month, State agency physician reviewed all the evidence and assessed the plaintiff's residual functional capacity. He concluded that the plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk or sit about six hours each in an eight-hour day, and occasionally climb, balance, stoop, kneel, crouch and crawl (Tr. 492-99).

In mid-April 2003, the plaintiff presented as a new patient to Dr. Angela Barron with complaints of dizziness and headaches. Dr. Barron's examination was unremarkable except for some trace edema in the lower extremities, and she instructed the plaintiff to follow up in the three weeks (Tr. 303-04). At that follow-up visit, Dr. Barron noted that the plaintiff's blood pressure was under "excellent control" and that it was "difficult to tell" if the plaintiff's back pain was due to uterine fibroids or fibromyalgia. She prescribed Mobic for body pain and Sedapap for headaches (Tr. 302).

When the plaintiff presented at her next, and last, visit of record with Dr. Barron on October 22, 2003, she complained of increased pain in her low back and legs for the past month. Examination was again unremarkable. Dr. Barron diagnosed arthritis and noted that the plaintiff's weight (240 pounds, 5'1" [Tr. 301, 308-328]) caused stress on her joints. She prescribed Bextra and Percocet (narcotic pain medications), but stated that she did "not want to make a habit of giving this lady Percocet" (Tr. 301).

Six months later, on April 29, 2004, Dr. Barron wrote a letter stating that the plaintiff could not work a full-time job due to fibromyalgia pain and dizziness (Tr. 526).

There was no evidence of additional medical treatment until January 2005, when the plaintiff was hospitalized with complaints of abdominal pain. Treatment notes indicated she was fully oriented, ambulated independently, could perform activities of daily living without assistance, and had normal behavior, equal strength in her extremities (Tr. 531), and full range of motion in all joints (Tr. 335). Physicians diagnosed her with pancreatitis (inflammation of the pancreas) and cholelithiasis (gallstones), and removed her gallbladder (Tr. 329-441, 527-35).

The following month, Dr. Woody Dixon evaluated the plaintiff for vocational rehabilitation. X-rays showed "[m]ild to moderate" osteoarthritis of the spine with some abnormal spinal curvature (Tr. 444), "mild" osteoarthritis of the knees (Tr. 446), and overgrowth in the cervical spine (Tr. 445). Dr. Dixon noted that the plaintiff walked with a cane and exhibited decreased range of motion of her extremities and spine and had some swelling in her wrists, fingers, ankles, and toes (Tr. 442-43).

On March 22, 2005, a State agency physician reviewed all the evidence and assessed the plaintiff's residual functional capacity. He concluded that the plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk or sit about six hours each in an eight-hour day, occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and never climb ladders, ropes, or scaffolds (Tr. 450-57).

On April 12, 2005, a form presumably completed by a physician (the signature is illegible) indicated that she had intact thought processes, appropriate thought content, a worried/anxious affect, depressed mood, and poor memory and concentration (Tr. 307).

On May 7, 2005, the plaintiff presented to Dr. Glenn Hooker for a psychiatric evaluation. Dr. Hooker noted she was fully oriented, walked slowly with a cane and had normal speech, no evidence of memory problems, a euthymic (pleasant, normal) mood, an appropriate affect, and intact judgment. She told Dr. Hooker she could drive, do some chores, shop, and care for her personal needs on a good day, but slept most of the day.

Dr. Hooker diagnosed major depressive disorder by history and a GAF score of 56[4] (Tr. 447-49).

In May 2005, a State agency psychologist reviewed all the evidence and completed a psychiatric review technique form. He indicated that the plaintiff had "mild" restrictions in activities of daily living; "moderate" difficulties in social functioning and concentration, persistence and pace; and no extended episodes of decompensation (Tr. 462-75). He also assessed the plaintiff's mental residual functional capacity. He found that the plaintiff was "moderately limited" in handling detailed instructions and "not significantly limited" in any other areas of work-related mental functioning. He concluded the plaintiff was capable of performing simple routine and repetitive tasks, concentrating as necessary for those tasks, interacting appropriately with co-workers and supervisors, and adapting to changes in the work setting (Tr. 458-61).

At the administrative hearing on October 2, 2006, the plaintiff testified she lived with her 18-year-old daughter (Tr. 561). She said she could not do any of her past work because of "bad pains in [her] back" that radiated into her hips and legs, neck pain, and dizziness (Tr. 568-69). She said she took medications for "stress," acid reflux, hypothyroidism, pain, sleep problems, headaches and high blood pressure, and that her daughter helped her with these (Tr. 570-89). She said the dizziness began in 2002 when she was working and that she took various medications for it (Tr. 575). She said she sometimes drove and that she read the Bible, other books and newspapers, although she had vision problems and dizziness (Tr. 589-90). She said she tried not to bend at all but could sometimes do so if she took her medications (Tr. 590). She said she could not stoop and had problems standing and sitting (Tr. 590). She said her daughters did most of the housework (Tr. 590-92). She said on a typical day she got up, drank coffee with her sister,

---

[4]A GAF score of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* DSM-IV-TR, Footnote 3, *supra*.

12

took a bath, got dressed, and ate dinner (Tr. 591-92). She said she used to grocery shop but that one of her daughters had done it for the past year (Tr. 592). She said she had difficulty remembering and concentrating (Tr. 593).

The plaintiff's daughter, Cenita Renee Gooding, testified that she lived over 300 miles away but visited her mother about twice per month (Tr. 595-96). She said that she had lived with her mother up until one year prior, and that she used to accompany and help her mother at work (Tr. 597-602). She said she, her husband and her sister did the housework during that time (Tr. 602-03). The plaintiff's other daughter, Ciera Joquata Seawright, testified that she had done most of the housework since before her mother quit working and that her mother tried to wash dishes and dust, but tired quickly (Tr. 606-07).

Adger Brown, a vocational expert, testified that the plaintiff worked in the past as a school custodian (skilled, medium); commercial custodian (unskilled, medium); day care assistant (semiskilled, light) (Tr. 607-08). *See* 20 C.F.R. §§ 404.1567 (defining light and medium work); 404.1568 (defining unskilled, semi-skilled, and skilled work). The ALJ asked Mr. Brown to assume and individual of the plaintiff's age, education, and past job experience with the following limitations:

- only simple, routine tasks in a supervised environment
- only occasional interaction with the public and routine interaction with co-workers
- no lifting/carrying over 20 pounds occasionally or 10 pounds frequently
- no standing or walking over 6 hours in an 8-hour workday
- only occasional stooping, twisting, crouching, kneeling, or climbing of ramps and stairs
- no climbing of ladders, ropes, or scaffolds

(Tr. 608-09). He testified that such an individual could perform the representative unskilled light jobs of grader/sorter (1,000 jobs in South Carolina, 52,000 nationwide), parts packer (3,500 jobs in South Carolina, 213,000 nationwide), and assembler (7,700 jobs in South Carolina, 514,000 jobs nationwide) (Tr. 609). Mr. Brown testified that if the plaintiff's claims

13

as to dizziness and concentration deficits were as bad as she testified, she could not work (Tr. 611).

## ANALYSIS

The plaintiff alleges disability since September 12, 2002, due to fibromyalgia, low intellectual functioning, and depression. The plaintiff was 48 years old on her alleged onset date and 52 years old at the time of her hearing. The ALJ found that the plaintiff's borderline intellectual functioning, fibromyalgia, depression, cervical disc disease, obesity, and arthritis were severe impairments. The ALJ further found that the plaintiff retained the residual functional capacity ("RFC") to perform a reduced range of unskilled light work with the following limitations: no lifting/carrying more than 20 pounds occasionally and 10 pounds frequently; no standing or walking over six hours in an eight-hour day; no more than occasional stooping, twisting, crouching, kneeling, or climbing ramps and stairs; no climbing ladders or scaffolds; and only simple, routine work in a supervised environment with no more than occasional interaction with the public or "team-type" interaction with co-workers (Tr. 21). The plaintiff argues that the ALJ erred by (1) failing to find that she met Listing 12.05C; (2) failing to give proper weight to the opinion of her treating physician; and (3) failing to include all of her impairments in the hypothetical question to the vocational expert.

### *Listing 12.05C*

The plaintiff alleges that the ALJ erred by failing to consider all the medical evidence and failing to find that she met Listing 12.05(C). *See* 20 C.F.R. Appendix 1, Subpart P, Listing 12.05(C). The regulations state that upon a showing of a listed impairment of sufficient duration, "we will find you disabled without considering your age, education, and work experience." 20 C.F.R. §404.1520(d).

14

Listing 12.05 is the listing related to mental retardation. Mental retardation refers to "a significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period [before age 22]." 20 C.F.R. Part 404, Subpt. P, App. 1, §12.05. Further, "[t]he required level of severity for this disorder is met when the requirements of A, B, C, or D are satisfied." *Id.* A claimant is to be found disabled under Listing 12.05(C) if he or she has the following: "A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." *Id.*

The plaintiff had an IQ of 65 when she was tested in the 8th grade (Tr. 134). She was 15 years and 7 months old at that time. She should have been in the 9th grade but she was a year behind, having failed the 5th grade (Tr. 133). The plaintiff was seen for a consultive psychological exam on January 20, 2003, by Dr. David J. Wheeler at the Monroe Counseling Center. She had a full-scale IQ of 70 on the WAIS-III. Dr. Wheeler diagnosed her with Major Depressive Disorder, Recurrent, Mild; Reading Disorder; Borderline Intellectual Function and Fibromyalgia. He ascribed to her a GAF of 45. Dr. Wheeler noted that the plaintiff's intelligence spanned the extremely low to borderline range of intellectual functioning for individuals in her age group. She had a significant problem with reading and suffered from recurrent major depression (Tr. 277). Dr. Wheeler found that the plaintiff could not maintain concentration, persistence, and pace for any length of time. Dr. Wheeler further found that the plaintiff could not perform simple, routine, repetitive tasks for long periods of time. On good days, she could perform simple cleaning activities. He also found that she would struggle to interact with peers and needed assistance handling her finances (Tr. 276-77).

The definition of mental retardation as propounded in the introductory paragraph of Listing 12.05 is as follows: "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially

15

manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpt. P, App. 1, §12.05.  The ALJ noted in his decision that Dr. Wheeler did not indicate a diagnosis of mental retardation and further found no evidence of deficits in adaptive functioning as required by the Listing (Tr. 21).  Substantial evidence does not support this finding.

Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills.  *West v. Com'r Social Sec. Admin.*, 240 Fed. Appx. 692, 698 (6th Cir. 2007) (citing *Heller v. Doe by Doe*, 509 U.S. 312, 329 (1993)). The ALJ noted that the plaintiff completed the 11th grade (Tr. 21).  However, the record shows that her IQ was 65 when tested during her 8th grade year (Tr. 134); she failed the 5th grade (Tr. 133); she was a C-D student (Tr. 447); most of her 9th and 10th grade scores were only in the 60s through the mid 70s (Tr. 132); and she had to receive speech therapy in school (Tr. 447).  Furthermore, when she was tested in 2003, Dr. Wheeler found that the plaintiff read at only the second grade level; that she could not perform simple and routine tasks for long periods or maintain concentration; that she would struggle interacting with peers; and that she would need assistance handling her finances (Tr. 275-77).  While the ALJ noted that the plaintiff lived independently because she did some cleaning, drove, read her Bible, and taught Sunday School, there was testimony that the plaintiff's daughters did most of the housekeeping, and the plaintiff drove "very little" (Tr. 589-91).  Further, there was no testimony regarding how long the plaintiff reads her Bible, or how much she understands or retains, or the age group to whom she taught Sunday School.  Lastly, the ALJ referenced the fact that the plaintiff worked in regular employment for years (Tr. 21). However, as noted by the plaintiff, her past relevant work had low educational and training requirements and provided no transferrable skills (Tr. 25).  Further, "[w]hen a claimant for benefits satisfies the disability listings, benefits are due notwithstanding any prior efforts of

the claimant to work despite the handicap." *Murphy v. Bowen*, 810 F.2d 433, 438 (4th Cir. 1987).

The plaintiff clearly meets the required level of severity for this disorder as set out in subsection (C) in that she has "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." 20 C.F.R. Part 404, Subpt. P, App. 1, §12.05(C). As discussed above, the evidence shows that the plaintiff had an IQ of 70 or below at ages 15 and 46 (in 2003) (Tr. 134, 276). The ALJ notes that the plaintiff had a verbal IQ score of 73, a performance IQ score of 72, and a full scale IW score of 70 when tested in 2003. However, as pointed out by the plaintiff, the lowest of the three IQ scores is used to determine if a claimant meets the Listing. *See* 20 C.F.R. Part 404 Subpt. P, App. 1, § 12.00(D)(6)(c).

Further, as to the second requirement that a claimant have a physical or other mental impairment imposing additional and significant work-related limitation of function, "[i]n this circuit, we follow the rule that if a claimant cannot return to his past relevant work, he has established a work-related limitation of function which meets the requirements of § 12.05(C)." *Flowers v. U.S. Dept. of Health & Human Services*, 904 F.2d 211, 214 (4th Cir. 1990) (citing *Branham v. Heckler*, 775 F.2d 1271, 1273 (4th Cir.1985)). Here, the ALJ determined that the plaintiff could not return to her past relevant work as a custodian and assistant in a daycare facility (Tr. 25). "Further, the Secretary has defined a severe impairment or combination of impairments as those which significantly limit an individual's physical or mental ability to do basic work activities." *Luckey v. U.S. Dept. of Health & Human Services*, 890 F.2d 666, 669 (4th Cir. 1989) (citing 20 C.F.R. §§ 404.1520(c), 1521(a) (1988)). Here, the ALJ found that the plaintiff's borderline intellectual functioning, fibromyalgia, depression, cervical disc disease, obesity, and arthritis were all severe impairments.

Substantial evidence does not support the ALJ's finding that the plaintiff's impairments did not meet or were not medically equal to Listing 12.05(C). As this court finds that the plaintiff should have been found disabled at step three of the sequential evaluation process, the remainder of the plaintiff's allegations of error will not be discussed.

## **CONCLUSION AND RECOMMENDATION**

The record does not contain substantial evidence supporting the Commissioner's decision denying the plaintiff disability benefits. Reopening the record for more evidence would serve no purpose. *See Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974) (finding that where case had been pending in the agency and courts for five years and had been remanded once before for additional evidence, reversal without remand was warranted). Therefore, based upon the foregoing, it is recommended that the Commissioner's decision denying the plaintiff's application be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the plaintiff be awarded benefits.

                                                                                 s/William M. Catoe
                                                                                 United States Magistrate Judge

June 2, 2009

Greenville, South Carolina